IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>v.<br><br>GEORGE BADGER; LAJUANA BADGER;<br>SB TRUST; DAVID BADGER AS TRUSTEE<br>FOR THE SB TRUST; ARDCO LEASING &<br>INVESTMENT LLC; AMERICAN<br>RESOURCES AND DEVELOPMENT<br>COMPANY, INC.; AND SPRINGFIELD<br>FINANCE AND MORTGAGE COMPANY,<br>LLC.,<br><br>      Defendants. | MEMORANDUM<br>DECISION AND ORDER<br><br>Case No. 2:10-cv-00935-RJS-PMW<br><br>Judge Robert J. Shelby |

In September 2010, the United States filed this action against George Badger; LaJuana Badger (Mr. Badger's wife); SB Trust; David Badger (Mr. Badger's son) as Trustee for the SB Trust; Ardco Leasing; Ardco; and Springfield Finance & Mortgage ("Springfield Finance"). (Dkt. 2.) In its Complaint, the United States alleges that a consent judgment entered in an earlier case required Mr. Badger to pay disgorgement of $13,436,950.54 and a civil penalty of $5,786,162, for a total liability of $19,223,112.54. (Dkt. 2 at ¶1.) The United States alleges that Mr. Badger has voluntarily paid only $2,228 toward the judgment. Other amounts collected on the consent judgment – totaling $4,320.22 – were involuntarily collected through deductions from his Social Security payments and federal tax refunds. (*Id.*) The United States also alleges that "[w]hen interest, administrative charges and penalties are added to this judgment, the total amount he owes exceeds $32 million." (Dkt. 91 at 2.) The United States contends that

"[i]nstead of paying the consent judgment to the extent he is able, Mr. Badger has used a series of nominees and alter egos to hide his assets and frustrate collection of the consent judgment." (Dkt. 2 at 1.)  The United States filed this action seeking a declaration that (1) Mrs. Badger is Mr. Badger's nominee; (2) the SB Trust is Mr. Badger's Nominee and/or Alter Ego; (3) Ardco Leasing is Mr. Badger's Nominee and/or Alter Ego; and (4) Ardco and Springfield Finance are Mr. Badger's Nominees and/or Alter Egos.  (Dkt. 2.)

## I.       Motions Pending Before the Court

On June 22, 2012, Defendants George Badger; LaJuana Badger; SB Trust; David Badger as Trustee for SB Trust; and Ardco filed two motions seeking partial summary judgment on claims against Mrs. Badger.  It appears there was an entry error in the filing of the first motion for partial summary judgment.  (Dkt. 79.)  So the motion was refiled on the same day.  (Dkt. 80.)

On August 8, 2012, Defendants George Badger; LaJuana Badger; SB Trust; David Badger as Trustee of SB Trust; and Ardco filed a motion to strike certain exhibits attached to the United States' opposition to Defendants' motion for partial summary judgment.  (Dkt. 97.)

Defendants Ardco and Springfield Finance each filed a motion for summary judgment on November 27, 2012, seeking to dismiss all claims against them.  (Dkt.  Nos. 109, 110.)  These motions appear to be supported by the same memorandum, which was filed twice.  (Dkt. Nos. 111, 112.)

On November 30, 2012, Defendants David Badger as Trustee of the SB Trust, SB Trust, and Ardco Leasing filed their own joint motion for summary judgment, seeking to dismiss all claims asserted against them.  (Dkt. 114.)

## II.        Summary of Dispute

The United States and the Defendants generally dispute four issues raised by the Defendants' summary judgment motions.

First, the Defendants argue that the United States' collection of Mr. Badger's liabilities from the Defendants is subject to the Federal Debt Collections Procedure Act (FDCPA), which they contend bars the claims the United States asserts against them. The United States submits that Mr. Badger's liabilities are disgorgement, which is not subject to the FDCPA.

Second, the Defendants argue that in order to show Defendants are nominees of Mr. Badger, the United States must set forth a state law theory demonstrating that Mr. Badger has a beneficial interest in the accounts and assets of the Defendants. The United States maintains that it need not make this preliminary state law showing. In view of its position, the United States attempted no such showing in its briefing.

Third, the Defendants note that in a traditional alter ego case, a party pierces the corporate veil for the purposes of finding an individual responsible for the liability of a corporation. Here, the Defendants argue that the United States improperly attempts to use the assets of the corporations to satisfy an individual's (Mr. Badger's) liability. Defendants argue that the United States is using the alter ego theory to "reverse pierce" the corporate veil. Defendants submit that this type of reverse piercing is not recognized under Utah law. In response, the United States contends that Utah courts would apply the traditional alter ego theory to reverse pierce the corporate veil on the facts presented here.

Finally, the Defendants argue that the court may not use its powers to order equitable relief against the Defendants because determinations on liability in this case involve questions of state law that are outside the scope of the court's power to order equitable relief. The United

States submits that the court's inherent powers permit it to order the Defendants to pay Mr. Badger's liabilities based on either a contempt theory or a nominal defendant theory.

## III.     Summary of Conclusion

After careful consideration and for the reasons stated below, the court enters the following rulings on the legal questions presented by Defendants' motions.

First, the FDCPA is inapplicable to the United States' claims for the collection of disgorgement in this action. For this reason, the United States' claims are not barred by the FDCPA.

Second, in order to establish that the Defendants are nominees of Mr. Badger, the United States must first set forth a state law theory why Mr. Badger holds a beneficial interest in the accounts and assets of the Defendants. But the United States has failed to do this. Thus, the nominee theory advanced by the United States fails as a matter of law.

Third, Utah courts do not recognize an alter ego theory that permits the United States to reverse pierce the corporate veil to find Defendants liable for the debts of Mr. Badger. The United States' alter ego theory fails as a matter of law.

Finally, the court declines to use its equitable powers, in this action, to order the Defendants to pay Mr. Badger's liabilities. Accordingly, the United States' equitable claims fail as a matter of law.

Thus, having found that the United States' nominee, alter ego, and equitable powers theories fail as a matter of law, the court enters the following rulings:

1.  The court DENIES as MOOT Defendants' motion for partial summary judgment. (Dkt. 79.)

2.   The court DENIES as MOOT Defendants' motion for partial summary judgment as to the Badger family home and the court GRANTS Defendants' motion for partial summary judgment as to the commodities futures investment account.  (Dkt. 80.)

3.   As the allegations against Mrs. Badger involve only the commodities futures trading account, the court DISMISSES Mrs. Badger from the case.

4.   The court DENIES the motion to strike United States' exhibits 2, 5, 6, 7, and 8 offered in opposition to Mrs. Badger's summary judgment motion.  (Dkt. 97.)

5.   The court GRANTS Defendant Ardco's and Defendant Springfield Finance's motions for summary judgment and DISMISSES them from this case.  (Dkt. Nos. 109, 110.)

6.   The court GRANTS Defendants David Badger as Trustee of the SB Trust, SB Trust, and Ardco Leasing's joint motion for summary judgment and DISMISSES them from this case.  (Dkt. 114.)

## BACKGROUND

The claims asserted by the United States relate to a tangled web of transactions between what appear to be related entities under circumstances suggesting Mr. Badger's control and direction.  The most relevant of these entities and transactions are described below.

## I.    The Red Hawk Project

Leasing Technology Incorporated (LTI) (now known as Defendant Ardco) was created in 1983 and engaged in the venture capital business.  (Dkt. 111 at 4; *see also* Stamos Deposition at 34:23-25, Dkt. 122-4 at 5.)  In 1990, LTI acquired the Palm Lakes real estate development project near St. George, Utah.  (Dkt. 111 at 4.)  The development was subsequently named the Red Hawk Project.  (*Id.*; *see also* Ardco 10K at 3, Dkt 122-6 at 4.)  At some point, the Red Hawk

Project expanded to include Cotton Acres and Cotton Manor properties. (Dkt. 111 at 4; *see also* Ardco 10K at 3, Dkt 122-6 at 4.)

In 1992, LTI (or Ardco) assigned the Red Hawk Project to Gold Ventures, Inc. (GVI), a publicly traded Utah Corporation, in exchange for 3,273,728 shares of GVI common stock, representing approximately 86% of its shares. (Dkt. 111 at 4.) GVI assumed all financial obligations related to the Red Hawk Project. (*Id.*) Mr. Badger was one of GVI's officers. (*Id.*) GVI needed funds for the development of the Red Hawk Project. (*Id.*) In order to obtain these funds, Mr. Badger bribed brokers to induce them to recommend and sell GVI securities to their customers. (*Id.* at ¶1.) In this way, Mr. Badger hoped to create a strong market for GVI stock. (*Id.*)

## II.     Mr. Badger's Previous Criminal and Civil Cases

Mr. Badger's fraudulent schemes and bribes became the subject of a criminal case in the Southern District of New York. (*Id.* at ¶2.) In April 1997, Mr. Badger pleaded guilty to (1) Conspiracy to Defraud the United States; (2) Manipulative and Deceptive Devices; (3) Criminal Contempt; and (4) Perjury. (Dkt. 122 at 9.) In December 1997, the Securities and Exchange Commission commenced a civil action against George Badger in the District of Utah seeking injunctive and monetary relief for Mr. Badger's securities violations in connection with GVI. (*SEC v. Badger, et al.*, No. 2:97-cv-963 (D. Utah), Dkt. 342.)

In December 2004, the Utah District Court entered a consent judgment against Mr. Badger. (*Id.*) The Honorable Dale A. Kimball ordered that Mr. Badger "is liable for disgorgement of $5,786,162.00, representing profits gained as a result of the conduct alleged in the Complaint, together with prejudgment interest thereon in the amount of $7,650,788.54, for a total of $13,436,950.54." (*Id.*) Judge Kimball also ordered that "[t]he Commission may enforce

the Court's judgment for disgorgement and prejudgment interest by moving for civil contempt (and/or through other collection procedures authorized by law)[.]" (*Id.*) The court further ordered Mr. Badger to "pay a civil penalty in the amount of $5,786,162.00." (*Id.*)

## III.    Miltex Industries

The United States alleges that in May 1995, a little over a year after the entry of the consent judgment, Mr. Badger arranged for 2,835,000 shares of GVI stock to be transferred to an account held by Miltex Industries at Banque SCS. (Dkt. 111 at 4-5; *see also* Badger Deposition at 76:9-77:5 ("I don't dispute [2,835,000 shares of GVI stock were sent to Miltex in 1995], but I don't remember"), Dkt. 122-3 at 3.) Miltex was represented by attorney Camille Froidevaux. (Dkt. 111 at 4-5.) The Miltex account at Banque SCS was under the care of Andy Ruegg. (Dkt. 122 at ¶1.) The GVI shares were worth $3,608,206 at the time of the transfer. (Dkt. 111 at 4-5; *see also* Accountant Expert Report at ¶5, Dkt. 122-21 at 3.)

In December 1996, Mr. Badger helped GVI obtain a loan from Miltex for $3,238,805, evidenced by a recorded collateralized note, to help fund development of the Red Hawk Project. (Dkt. 111 at 5; *see also* Badger Deposition at 120:9-121:3 ("I don't know if I was instrumental in obtaining [the loan], but I maybe helped Gold Ventures obtain this loan."), Dkt. 122-3.)

Miltex provided additional loan amounts to GVI in 1997. (Badger Deposition at 121:4-16, Dkt. 122-3.) These loan amounts passed from Miltex, to Mr. Badger's account, to GVI. (*Id.* at 121:9-122:24; *see also* Testimony of George H. Badger Re: Miltex Bankruptcy Claim, Dkt. 122-23.)

In November 1996, GVI executed a reverse merger with Gold Communities of America (GCA). (Dkt. 111 at 5; *see also* Ardco 10K at 3, Dkt 122-6 at 4.)[1] In the process, Miltex's recorded collateralized note from the December 1996 GVI loan was subordinated to a much larger loan to GCA from Credit Suisse First Boston. (*Id.*)

GCA ultimately filed for bankruptcy protection in 1999. Almost all of Ardco's interest from assigning the Red Hawk Project to GVI and Miltex's interest from lending money to GVI were lost. (*Id.*)

## IV. Springfield Investment, Springfield Finance, and Ardco

In April 2001, Springfield Investment purchased the Cotton Acres and Cotton Manor properties in the GCA bankruptcy procceding. These were part of the Red Hawk Project owned by GCA prior to its bankruptcy. (Dkt 111 at 6.) The United States alleges that Mr. Badger was involved in the negotiations to purchase the properties from the GCA bankruptcy trustee. (Stamos Deposition at 31:13-32:11 (acknowledging that Mr. Badger might have been involved in negotiating the purchase of Cotton Acres and Cotton Manor), Dkt. 122-4.)

Mr. Badger arranged for his wife and Miltex Industries to finance Springfield Investment's purchase of the properties. (Stamos Deposition at 39:8-41:22 (noting that Mr. Badger arranged the contact between Miltex and Mrs. Badger to finance the purchase of Cotton Acres and Cotton Manor), Dkt. 122-4.) Subsequent to the purchase of Cotton Acres and Cotton Manor by Springfield Investments, Springfield Investment's subsidiary, Springfield Finance, began to develop the Cotton Acres and Cotton Manor properties.

---

[1] A reverse merger is typically an acquisition of a public company by a private company so that the private company can bypass the lengthy and complex process of going public.

Between 2001 and 2005, Miltex made a series of loans to Springfield Investments and Springfield Finance totaling approximately $1.5 million for the development of Cotton Acres and Cotton Manor. (Accounting Schedule of Mr. Froidevaux, Dkt. 122-13; *see also* Badger Deposition 170:11-20, Dkt. 122-3.)  Mr. Badger helped arrange for these loans.  (Badger Deposition 170:3-25, Dkt. 122-3.)  The United States alleges that the loans from Miltex to the Springfield entities appear to have been made without any serious due diligence or negotiations on the part of Miltex or its attorney Mr. Froidevaux.  (Badger Deposition 171:1-174:2, Dkt. 122-3.)  Mr. Badger could neither confirm nor deny these allegations.  (*Id.*)  In addition, according to Ardco and Springfield records, the Miltex loans have not been paid.  (Dkt. 122 at 14, 18; *see also* Stamos Deposition 74:2-77:25, Dkt. 122-7 at 6.)

## V.     SB Trust and Ardco

In 1998, Mr. and Mrs. Badger created the SB Trust.  (SB Trust Agreement, Dkt. 122-17.) The beneficiaries of SB Trust are Mr. Badger's children.  (*Id.*)  David Badger, Mr. Badger's son, is the trustee.  Mr. and Mrs. Badger initially funded the trust with shares of Ardco.  The trust later obtained additional shares of Ardco.

The United States alleges that despite the fact that he is not a named beneficiary, the SB Trust pays many of Mr. Badger's personal living expenses.  For example, the SB Trust pays for the operation of Mr. Badger's vehicle, including gas charges and other credit card charges.  The SB Trust pays Mr. Badger's utility, cell phone, and lawn care bills.  The SB Trust also makes the payments on a $235,000 line of credit that Mr. Badger took out in 1998, and which is secured by the home where Mr. Badger lives.  In addition, the SB Trust made direct payments to Mr. and Mrs. Badger.  For example, Mr. and Mrs. Badger reported $75,000 in payments from the SB Trust during 2007.  The SB Trust made a $3,500 payment to Mrs. Badger for consulting in

January 2008.  The SB Trust made an additional $24,500 in payments to Mr. Badger in April 2008.

The United States also alleges that Mr. Badger handles the major transactions for the SB Trust without input from his son, and that Mr. Badger directs and controls the SB Trust.  For example, Mr. Badger arranged for the SB Trust to assume responsibility to pay the debt (then totaling $1,644,818.28) owed by Ardco and Springfield Investment to Miltex.  Mr. Badger represented the SB Trust in this transaction.  Mr. Badger's son David, the trustee of SB Trust, was not aware of the transaction and does not know why it would have been in the best interest of the beneficiaries of the SB Trust.  (Dkt. 122 at 30.)  There is no evidence that SB Trust made payments to Miltex or that Miltex has taken steps to collect the payment from SB Trust.  (Dkt. 122 at 14-15.)

In 2004, Ardco (previously named LTI) was an empty shell company without any operations.  (Stamos Deposition at 43:17-19, Dkt. 122-4.)  Thomas Stamos (previous son-in-law of Mr. Badger and father of Mr. Badger's grandchildren) was the President and Chairman of Ardco and President of Springfield Investment.  (*Id.* at 44:22-45:3, Dkt. 122-4.)  Mr. Stamos and Mr. Badger determined that it would be best for Ardco to purchase Springfield Finance from Springfield Investment.  (*Id.* at 42:21-47:8, Dkt. 122-4.)  Springfield Finance became a subsidiary of Ardco.  (*Id.*)

As of 2009, Miltex was the largest shareholder of Ardco with over 50% of the outstanding shares.  SB Trust is the next largest shareholder with approximately 31% of the outstanding shares of Ardco.  Mr. Stamos owns 12%.  Ownership of the remaining 4.64% is spread over approximately 1,000 shareholders.  (Dkt. 122 at 15.)

## VI.    Mr. Badger's Home

Mr. and Mrs. Badger were married for 58 years.  (Dkt. 81 at ¶16.)  In 1961, Mr. and Mrs. Badger purchased a home in Salt Lake City for approximately $40,000.  (Dkt. 81 at 6.)  In 1966, the home was transferred solely to Mrs. Badger.  In 2005, Mrs. Badger transferred the deed to that home to SB Trust.  (Dkt. 91 at 16.)  Mr. and Mrs. Badger, however, continued to live in the home.  In 2012, Mrs. Badger passed away.  Mr. Badger now lives in the home alone.

## VII.    Ardco Leasing

The United States alleges that Ardco Leasing is a subsidiary of Ardco.  The United States also alleges that Ardco Leasing exists for the sole purpose of enabling Mr. Badger to purchase a car for personal use.  For example, Ardco Leasing's designated office is Mr. Badger's home.  (Ardco Leasing 2008 Tax Returns, Dkt. 121-24 at 2.)  In addition, Mr. Badger arranged for a transfer of $23,500 from his home equity line of credit to Ardco Leasing, then Ardco Leasing purchased a car that Mr. Badger drives for his personal use.  (Dkt. 121 at 19.)

## VIII.    Mrs. Badger's Commodities Futures Trading Account

Mrs. Badger opened a commodities futures trading account in September 2006.  (*Id.* at ¶21.)  The commodities futures trading account was settled with money lent to her by Ardco's subsidiary Springfield Finance and SB Trust.  (*Id.* at ¶22.)  Mrs. Badger had no prior work experience in accounting, finance, or investing.  (Dkt. 122 at 27.)  Despite this, Springfield Finance and SB Trust loaned Mrs. Badger $564,147.76.  (Mrs. Badger's Account Ledger, Dkt. 122-9 at 2.)  The United States alleges that Springfield Finance loaned this money to Mrs. Badger without any credit check or other forms of due diligence on Mrs. Badger.  Mr. Stamos, who approved the loan, only recalls dealing with Mr. Badger regarding this loan.  In addition, Mr. Stamos testified that if another Ardco shareholder had asked for a similar loan, he probably

would not have provided it.  (Stamos Deposition at 112:6-13, Dkt. 22-4 at 22.)  After Mrs. Badger opened the account, Mr. Badger acted as Mrs. Badger's agent.  He invested the money and monitored the investment for Mrs. Badger.  (Dkt. 122 at ¶25.)

In 2007, the account generated short term capital gains of $347,863.  Mr. and Mrs. Badger claimed this gain on their joint tax return for 2007.  (*Id.*)  Mr. and Mrs. Badger have not repaid this loan from Springfield Finance and SB Trust.  (Dkt. 122 at 28.)  This loan was forgiven as part of a 2008 debt restructuring plan.  As part of the plan, SB Trust assumed responsibility to pay $1,644,818.28 owed by Ardco/Springfield to Miltex.  There is no evidence that SB Trust made payments to Miltex or that Miltex has taken steps to collect the debt from SB Trust.  (Dkt. 122 at 14-15.)

## ANALYSIS

### I.    Legal Standards for Summary Judgment

Rule 56(a) of the Federal Rules of Civil Procedure states that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  In making this determination, the court "view[s] the evidence and make[s] all reasonable inferences in the light most favorable to the nonmoving party."  *N. Natural Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008).

"The moving party has the initial burden of demonstrating the absence of any genuine issue of material fact to support the non-moving party's case."  *Jensen v. Kimble*, 1 F.3d 1073, 1076-77 (10th Cir. 1993) (citing *Celotrex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  "Once a party moving for summary judgment has met his initial burden, the party resisting the motion cannot rest on his pleading."  *Coffey v. Healthtrust, Inc.*, 955 F.2d 1388, 1393 (10th Cir. 1992).

"A party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered." *Id.* (citing *Liberles v. County of Cook*, 709 F.2d 1122, 1126 (7th Cir. 1983)). "If the nonmoving party fails to make this showing with respect to any element essential to its case and on which it bears the burden of proof at trial, then the moving party is entitled to summary judgment since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Jensen*, 1 F.3d at 1077 (citing *Celotrex*, 477 U.S. at 323).

## II.     Motion to Strike

As a preliminary matter, Defendants George Badger; LaJuana Badger; SB Trust; David Badger as Trustee of SB Trust; and Ardco jointly filed a motion to strike Exhibits 2, 5, 6, 7, and 8 filed in support of the United States' opposition to Mrs. Badger's motion for partial summary judgment.  The court examines each group of challenged exhibits in turn.

### A.     Exhibit 2 and Exhibit 5

The Defendants argue that Exhibit 2, which discusses a previous court enforcement action against Mr. Badger, is inadmissible hearsay.  The Defendants also argue that Exhibit 5, which is a letter from the SEC discussing Mr. Badger's previous civil case before Judge Kimball, is inadmissible hearsay and lacks foundation.  The court denies as moot the motion to strike Exhibit 2 and Exhibit 5 as these exhibits play no role in the court's resolution of the summary judgment motions.

### B.     Exhibit 6, Exhibit 7, and Exhibit 8

The Defendants generally make conclusory assertions that Exhibit 6, a specific page bearing Bates No. 7768 within Exhibit 7, and Exhibit 8 are inadmissible.  Exhibit 6 is a fax from Mr. Foidevaux to Mr. Badger regarding Mr. Badger's accounts.  Bates No. 7768 within Exhibit 7

reflects shares of stock owned by Mr. Badger. Exhibit 8 is an expert report. These exhibits were copies of documents produced by Mr. Badger. The court discusses the admissibility of these documents below.

### 1. Legibility

Defendants assert that Exhibit 6 is inadmissible because it is illegible. Indeed, the document is difficult to read. But based on a close examination of the document, the court finds that the document is not illegible. For example, it is clear from the context of the document that Mr. Froidevaux's fax pertains to Gold Ventures' transactions executed by Miltex. In addition, the document is legible enough to support the United States' allegations that GVI transferred 2,835,000 shares to Miltex.

### 2. Authenticity

Defendants next assert that there is a question about the authenticity of Exhibit 6 and Bates No. 7768, especially since Mr. Badger testified in a deposition that he did not have knowledge of the facts contained in these documents. Under Rule 1003, "[a] duplicate is admissible to the same extent as the original unless a genuine question is raised about the original's authenticity or the circumstances make it unfair to admit the duplicate."

The Tenth Circuit has held that "[w]e do not require an affidavit to authenticate every document submitted for consideration at summary judgment. Rather, documents produced during discovery that are on the letterhead of the opposing producing party are authentic per se . . . [for] documents that were not printed on [opposing party's] letterhead . . . [it] might be sufficiently authenticated taking into consideration the appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstance." *Law Co., Inc. v. Mohawk Const. & Supply Co., Inc.*, 577 F.3d 1164, 1170-71 (citing Fed. R. Evid. 901).

Also, if the "exhibits are reproductions of documents obtained from defendant's files, their authenticity cannot be seriously disputed." *Attorney General of the United States v. Irish Northern Aid Committee*, 530 F.Supp. 241, 252 (S.D.N.Y. 1981).

In this case, after close examination, the court finds that the appearance, contents, substance, and internal patterns, taken in conjunction with the circumstances, all support the authenticity of these documents. For example, Bates No. 7768 was produced by Mr. Badger as a page within a larger document that contains Mr. Badger's 2004 tax returns. Mr. Badger does not contest the reliability of the tax return itself, only the one page produced with the 2004 tax returns. The court finds that Bates No. 7768 itself and the circumstance surrounding its production make it sufficiently authentic for consideration at this stage.

In addition, at least at the time of production, Mr. Badger believed it trustworthy and relevant so as to produce Exhibit 6 and Bates No. 7768 to the government. Therefore, the authenticity of these documents cannot seriously be questioned. The court finds that Rule 1003 does not preclude the admissibility of Exhibit 6 and Bates No. 7768 of Exhibit 7 for purposes of evaluating summary judgment.

### 3. Privilege

Defendants also argue that Exhibit 8 is privileged work product, and thus inadmissible. Defendants also contend that it was inadvertently disclosed and subject to clawback. But, the United States argues, and Defendants do not dispute, that Mr. Badger's prior attorney provided this report to the SEC in connection with an earlier SEC litigation in an effort to identify the level of market damage caused by Mr. Badger's fraud. Since it was voluntarily and intentionally provided to the SEC by Mr. Badger's agent in an effort to benefit Mr. Badger, it is neither subject to privilege nor clawback.

### 4. Incomplete

Defendants also argue, without explanation, that Exhibit 8 is inadmissible because it is incomplete under Rule 1003. The court does not find this document incomplete.

### 5. Hearsay

Defendants finally argue that Exhibits 6 and 8 are inadmissible hearsay. But under Rule 801(d)(2), "a statement is not hearsay if it is offered against a party and is a statement of which he has manifested his adoption or belief in its truth." *Grundberg v. Upjohn Co.*, 137 F.R.D. 365, 370 (D. Utah 1991). "Even if the person adopting the statement had no personal knowledge or first hand information about the [documents], if a person manifests their acceptance of information, the admission by adoption is admissible non-hearsay evidence." *Id.* Thus, whether Mr. Badger remembered these specific documents during his deposition or not, he manifested his acceptance of the information contained in the documents when he provided them to his attorney, who in turn provided them to the SEC. Therefore, the court finds that these documents are admissible under Rule 801(d)(2).

Moreover, under Rule 807, a statement is not excluded by the rule against hearsay if "the statement has equivalent circumstantial guarantees of trustworthiness." In this case, Mr. Badger believed these documents trustworthy and relevant. He provided these documents to his attorney, who in turn provided them to the SEC – presumably with the intent that the SEC would rely on them. Further, based on examination of the documents, there is no reason to doubt their trustworthiness. Thus, the court finds that these documents are admissible under Rule 807.

For these reasons, the court denies Defendants' motion to strike Exhibits 6, 7, and 8.

## III.    FDCPA

All parties agree that the prior consent judgment required Mr. Badger to pay disgorgement of $13,436,950.54.  And all parties agree that this disgorgement would not be governed by the FDCPA if the United States sought to collect it directly from Mr. Badger himself.  *See SEC v. Huffman*, 996 F.2d 800, 802-803 (5th Cir. 1993) ("[D]isgorgement is not a debt under the Debt Act."); *see also SEC v. AMX, Int'l, Inc.*, 7 F.3d 71, 75 ("[I]t is appropriate to conclude that a court order compelling disgorgement does not constitute a debt.").

But Defendants Ardco (Dkt. 109); Springfield Finance (Dkt. 110); and David Badger as Trustee of the SB Trust, SB Trust, and Ardco Leasing (Dkt. 114) all contend that this action does not sound in disgorgement and is thus governed by the FDCPA for three reasons.  First, Defendants argue that the United States has admitted that the FDCPA is applicable to the case and cannot now argue otherwise.  Second, Defendants argue that this action is not an action for disgorgment because if it were, the United States would have to identify the illegal funds held by Defendants, and show the Defendants were engaged in wrongdoing.  And the United States has not attempted to do so.  Third, Defendants argue that this action has the characteristics of a traditional money judgment, and that money judgments are governed by the FDCPA.

Moreover, the Defendants argue that because this action is governed by the FDCPA, it fails because it is time-barred under the FDCPA, and the FDCPA does not recognize a nominee or alter-ego theory.

The court addresses each of these arguments in turn.

### A.    The United States Has Not Admitted the Applicability of the FDCPA

Defendants contend that because it asserted in the prior action between the SEC and Mr. Badger that the FDCPA was applicable, the United States cannot now reverse course and argue

that the FDCPA is inapplicable to the same liability.  Specifically, the Defendants rely on a January 18, 2013 SEC opposition to a motion to quash a subpoena served on Mr. Stamos, the director of Ardco.  (Opposition to the Motion to Quash, Dkt. 125-1.)  In its opposition, the SEC noted that Mr. Badger consented to liability for disgorgement of $13,436,950.54 and assessment of a civil penalty of $5,786,162.00 for a total liability of $19,223,112.54.  With interest, administrative charges, and penalties added to this judgment, the total amount owed by Mr. Badger as of March 17, 2009 was $31,781,989.17.  In addition, the SEC noted that Mr. Badger had paid only a total of $2,050.  After describing Mr. Stamos's relationship to the case, and the need for the subpoena, the SEC stated its conclusion that "[t]he SEC is entitled to conduct discovery regarding George Badger's financial condition pursuant to the Federal Rule of Civil Procedure and the FDCPA, because he owes the SEC more than $31,000,00 based on the Court's 2004 consent judgment."  (*Id.*)

While the SEC mentioned the FDCPA in its papers, the SEC did not specifically argue that the FDCPA is applicable to the disgorgement.  Rather, it is more likely that the SEC was arguing that the FDCPA was potentially relevant to the collection of the civil penalty, if at all.  Therefore, the court finds that the SEC's passing mention of the FDCPA in briefing on a discovery-related dispute does not estop the United States from now arguing that the FDCPA has no application to Judge Kimball's Order.

### B.     The United States Is Not Seeking a Separate Disgorgement Order

Defendants next argue that if the United States were seeking a disgorgment order against them, the United States would first be required to identify the illegal funds held by Defendants, and show the Defendants were engaged in wrongdoing.  Because the United States failed to do this, Defendants submit they cannot be subject to disgorgement, and any attempts to collect from

Defendants cannot be considered disgorgement. Defendants argue this action is more appropriately considered a debt collection effort subject to the FDCPA.

Indeed, "[d]isgorgement is by nature an equitable remedy." *SEC v. Maxxon, Inc.*, 465 F.3d 1174 (10th Cir. 2006). As such, the individuals and sums subject to disgorgement must have the following characteristics: (1) disgorgement relates to ill-gotten gains from specific unlawful conduct, and the SEC must generally distinguish between legally and illegally obtained profits – only the illegally obtained profits are subject to disgorgement; and (2) disgorgement is a remedy for the individual wrongdoer. *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1231 (D.C. Cir. 1989).

But in this case, the the United States is not seeking a disgorgement order against the Defendants. If the United States were to do so, it would need to (1) distinguish between Defendants' legally and illegally obtained profits, and (2) establish that the Defendants are individual wrongdoers. Rather, Judge Kimball has already ruled that Mr. Badger is liable for disgorgement of $5,786,162.00 and that the United States may bring an appropriate action to collect. (*SEC v. Badger, et al.*, No. 2:97-cv-963 (D. Utah), Dkt. 342.) And in accordance with Judge Kimball's Order, the United States brings this action to enforce the disgorgement Order against Mr. Badger. In short, the United States contends that the accounts and assets of the Defendants belong to Mr. Badger under either a nominee or alter ego theory, and as such should be used to satisfy the ordered disgorgement.

Accordingly, the court finds that this action is an attempt by the United States to collect an already existing disgorgement obligation, and is therefore not subject to the FDCPA.

### C.    This Is Not a Separate Action for Money Judgment

Defendants also argue that equitable remedies, such as disgorgement, are generally enforced through contempt or imprisonment.  50 C.J.S. Judgments, § 924.  In contrast, a money judgment governed by the FDCPA is generally enforced through attachment, garnishment, and supplemental proceedings.  *Id.*  Defendants agree that the disgorgement order in the prior SEC action was an equitable remedy.  But they contend this is a separate action against the Defendants more properly considered a money judgment collection action governed by the FDCPA.

As stated previously, the United States seeks a declaration that the Defendants are Mr. Badger's nominees and/or alter egos.  In other words, the United States contends that the accounts and assets of the Defendants belong to Mr. Badger, and as such should be used to satisfy the disgorgement order.  This is not a separate action for a money judgment against the Defendants.

The court finds that this action is not subject to the FDCPA.

### D.    FDCPA Statute of Limitations

Having determined that the FDCPA is not applicable, the court need not decide whether the action is time-barred by the FDCPA.  Nor must the court decide whether the FDCPA recognizes the nominee or alter-ego theories urged by the United States for recovery of debts.

### E.    Civil Penalties

Defendants argue, in a footnote, that irrespective of whether the FDCPA is applicable to the disgorgement liability, the FDCPA is nevertheless relevant to the civil penalty amount in the consent judgment.  (Dkt. 111 at 14 n.9 ("However, the FDCPA may be applicable to George Badger to the extent that the Plaintiff attempts to collect the fine provision in the Consent Decree

because fines and penalties are expressly included in the Act.  28 U.S.C. § 3002(3).")  The United States appears to admit, in a footnote of their own, that the FDCPA applies to civil penalties, but argues "Mr. Badger's assets do not appear sufficient to satisfy the penalty here, so any issues regarding such penalties are effectively moot."  (Dkt. 140 at 2 n.1.)  Because it appears that the United States is not pursuing the payment of civil penalties from the Defendants, and neither side has adequately briefed the issue, the court does not reach the question of whether the FDCPA applies to collection of Mr. Badger's civil penalty.

## IV.     Nominee Theory

The United States seeks a declaration that Defendants hold assets as nominees of Mr. Badger, and as a result, Defendants' assets are available to satisfy Mr. Badger's consent judgment liability.  The so-called nominee theory is well-established in federal tax law.  The Tenth Circuit explained that the nominee theory is applicable to situations where a taxpayer fraudulently conveys or transfers property to avoid legal obligations.  *See In re Krause*, 637 F.3d 1160, 1164 (10th Cir. 2011).  In these situations, federal courts will find that "property transferred from a delinquent taxpayer to a nominee is subject to the collection of the taxpayer's tax liability."  *United States v. Reed*, 168 F. Supp. 2d 1266, 1268 (D. Utah 2001) (citing *G.M. Leasing Corp. v. United States*, 429 U.S. 338, 350-51 (1977)); *see also* IRM 5.17.2.5.7 (Dec. 14, 2007) ("As used in the federal tax lien context, a nominee is generally a third-party individual who holds legal title to property of a taxpayer while the taxpayer enjoys full use and benefit of that property.  In other words, the federal tax lien extends to property 'actually' owned by the taxpayer even though a third party holds 'legal' title to the property as nominee. . . . A nominee situation generally involves a fraudulent conveyance or transfer of a taxpayer's property to avoid a legal obligation.").  It is not clear, however, whether the nominee theory is applicable in this

case, where no tax lien is at issue. Nevertheless, the court is mindful that the parties have relied extensively on *Holman v. United States*, 505 F.3d 1060, 1063 (10th Cir. 2007), a Tenth Circuit case regarding nominee tax liens, to support their arguments. In view of the parties' reliance, the court will discuss *Holman* below.

In *Holman*, Mrs. Holman brought an action seeking to quiet title on a piece of property in Centerville, Utah, free and clear of a tax lien asserted by the IRS under 26 U.S.C. § 6321. *Holman*, 505 F.3d at 1063; *see also* 26 U.S.C. § 6321 ("If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount . . . shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person."). The IRS contended that Mrs. Holman held that property only as a nominee of Mr. Holman, and as a result, the IRS could enforce a tax lien on the property. The district court held that because Mr. Holman did not transfer legal title of the property to Mrs. Holman, Mrs. Holman could not be a nominee of Mr. Holman.

The Tenth Circuit vacated the district court's decision, finding that "the district court erred in holding that, standing alone, the lack of a transfer of legal title to the Centerville property from Mr. Holman to Mrs. Holman is sufficient as a matter of law to defeat enforcement of the nominee lien asserted by the IRS." *Id.* at 1066.

The Tenth Circuit explained that application "of the nominee doctrine involves questions of both state and federal law. We look initially to state law to determine what right the taxpayer has in the property the IRS seeks to reach. If the court concludes that the taxpayer has a property interest under state law, then federal law determines whether the taxpayer's state-delineated rights qualify as property or rights of property within the compass of federal tax lien legislation." *Id.* at 1067; *see also Spotts v. United States*, 429 F.3d 248, 251 (6th Cir. 2005) ("[A] federal tax

lien does not arise or attach to property in which a person has no interest under state law. . . . Once state law determines that a property interest exists, federal law dictates the tax consequences.").  In providing guidance on how the IRS could establish that the taxpayer has a property interest under Utah law, the Tenth Circuit stated "Utah's case law indicates that a party [such as Defendants] may hold legal title in trust for a beneficial owner [under the doctrine of resulting trusts.]"  *Holman*, 505 F.3d at 1068 (citing *Parks v. Zions First Nat'l Bank*, 673 P.2d 590, 598-600 (Utah 1983)); *see also In re Taylor*, 133 F.3d 1336, 1351 (10th Cir. 1998) (finding that Utah case law recognizes express, constructive, and resulting trust to show legal or equitable interests in property).

The Tenth Circuit remanded the case for the district court to "resolve the question of whether Mr. Holman had an interest in the Centerville property under Utah law and, if so, whether the IRS's nominee lien could be enforced as a matter of federal law."  *Holman*, 505 F.3d at 1067.[2]  The Tenth Circuit further held that "[o]n remand, the IRS should identify the theory or theories under which it asserts that Mr. Holman has a beneficial interest in the Centerville property under Utah law.  To enforce the tax lien on [the] Centerville property, the IRS must establish that Mr. Holman has such an interest.  If the IRS makes that showing under state law, the district court should then determine as a matter of federal law whether the nominee lien should be enforced."  *Id.* at 1068.

_____

[2] *See also Drye v. United States*, 528 U.S. 49, 51 (1999) ("This Court looks initially to state law to determine what rights the taxpayer has in the property the Government seeks to reach."); *In re Krause*, 637 F.3d at 1163 ("To determine whether a particular assets falls within the reach of a § 6321 lien . . . [first] we must ask what rights under state law, if any, the taxpayer has in the asset the IRS seeks to attach.  This step is necessary at the outset because it is, after all, state laws that create legal interests and rights in thing."); *Scoville v. United States*, 250 F.3d 1198, 1202 (8th Cir. 2001) (finding that whether plaintiff had interest in property is a question of state law); *Spotts*, 429 F.3d at 251 ("A federal tax lien does not arise or attach to property in which a person has no interest under state law.")

Thus, assuming that the nominee theory discussed in *Holman* applies to the enforcement of Mr. Badger's consent judgment, it is clear that the United States must initially identify the theory or theories under which it asserts that Mr. Badger has a beneficial interest in the Defendants' assets under Utah law. But despite the Tenth Circuit's guidance concerning possible theories under Utah trust law whereby the United States may assert that Mr. Badger has a beneficial interest in the assets of the Defendants, and the Defendants' explicit invitation in their moving papers for the United States to identify such theories, the United States has failed to do so.[3] This is not a technical omission, but a substantive failure of proof on an essential element of the government's case.[4]

---

[3] *See* Dkt. 98 (explaining that the United States could possibly show that Mr. Badger had a beneficial interest in the assets of Defendants under Utah state law theories of express, resulting, or constructive trusts); *see also* Dkt. 115 (same).

[4] It is conceivable, if given another chance to replead its case or rebrief its responses to the summary judgment motions, the United States might present sufficient facts for a reasonable jury to conclude that the Defendants are liable for Mr. Badger's consent judgment. But it is well-settled that "a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered." *Coffey*, 955 F.2d at 1393 (citing *Liberles*, 709 F.2d at 1126). And when "a party chooses to pursue only one [theory] at summary judgment, and then, when [that] theory fails on the merits, seeks to revisit [a] discarded theory . . . that [the party] recognized was available but expressly chose not to pursue would appear to countenance precisely the second bite at the apple that ordinarily is not permitted." *U.S.A. Petroleum Co. v. Atlantic Richfield Co.*, 13 F.3d 1276, 1286 (9th Cir. 1992) (holding that a party may not reopen discovery to revisit a previously discarded theory but also applying this reasoning to summary judgment responses); *see also Cooper v. Lane*, 969 F.2d 368, 371 (7th Cir. 1992) ("[O]ur law is clear that we will not consider arguments which were not presented to the district court in response to a summary judgment motion."); *Image Technical Serv., Inc. v. Eastman Kodak Co.*, 903 F.2d 612, 615 n.1 (9th Cir. 1990) (finding failure to raise a theory in response to summary judgment to have waived it for appeal), *aff'd*, 504 U.S. 451 (1992); *Savers Federal Savings & Loan Ass'n v. Reetz*, 888 F.2d 1497, 1501 (5th Cir. 1989) ("[E]ven a pleaded theory [is] waived when it [is] not raised in opposition to a motion for summary judgment. That the matter was subsequently raised in the district court by a motion to reconsider the summary judgment did not suffice to save the day."); *Lone Star Steel Co. v. United Mine Workers of Am.*, 851 F.2d 1239, 1243 (10th Cir. 1989) ("Ordinarily, a party may not lose on one theory of the case, and then prevail on appeal on a different theory.").

Thus, notwithstanding the serious allegations of wrongdoing by Mr. Badger to avoid the consent judgment, the court finds that the United States failed to make a required showing with respect to an element essential to establishing whether the Defendants hold assets as nominees of Mr. Badger. The court grants the Defendants' summary judgment motions with respect to that claim.[5] *See Jensen*, 1 F.3d at 1077 ("If the nonmoving party fails to make [a] showing [of the reasons, legal or factual, why summary judgment should not be entered] with respect to any element essential to its case . . . then the moving party is entitled to summary judgment.").

## V.      Alter Ego Theory

As part of their respective motions for summary judgment, Defendants Ardco; Springfield Finance; David Badger as Trustee of the SB Trust; SB Trust; and Ardco Leasing contend that the claims pursued by the United States must be dismissed because the United States is impermissibly relying on a theory of "reverse piercing" the corporate veil, which is not recognized under Utah law. (Dkt. Nos. 109, 110, and 114.) Specifically, the Defendants argue that in a traditional alter ego theory, a defendant pierces the corporate veil for the purposes of finding an individual responsible for the liability of the corporation. Here, the United States attempts to use the assets of the corporations to satisfy Mr. Badger's personal liability. Defendants argue that this type of reverse piercing is not recognized under Utah law. In

---

[5] Defendants also contend that Mrs. Badger did not hold the Badger home as a nominee of Mr. Badger. But the United States has not alleged that Mrs. Badger held the home as a nominee of Mr. Badger. Rather, the United States alleges that Mrs. Badger transferred the deed to her home to SB Trust in 2005. The United States further alleges that SB Trust is a nominee and/or alter ego of Mr. Badger. So, the United States seeks a declaration that the assets of SB Trust, including the home, are available to satisfy the consent judgment against Mr. Badger. Accordingly, the court need not decide whether Mrs. Badger held the home as a nominee of Mr. Badger, and the court finds that the Defendants' motion seeking a partial determination that Mrs. Badger did not hold the Badger family home as a nominee of Mr. Badger is denied as moot.

response, the United States contends that Utah courts would apply the traditional alter ego theory to reverse pierce the corporate veil on the facts here presented.

The Tenth Circuit explains that in a traditional alter ego case, "the corporate form will be disregarded and the personal assets of a controlling shareholder or shareholders may be attached in order to satisfy the debts and liabilities of the corporation." *N.L.R.B. v. Greater Kansas City Roofing*, 2 F.3d 1047, 1051 (10th Cir. 1993). In Utah, a party seeking to pierce the corporate veil must establish (1) "such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist, viz., the corporation is, in fact the alter ego of one or a few individuals; and (2) the observance of the corporate form would sanction a fraud, promote injustice, or an inequitable result would follow." *Cascade Energy & Metals Corp. v. Banks*, 896 F.2d 1557, 1576-77 (10th Cir. 1990) (citing *Norman v. Murray First Thrift & Loan Co.*, 596 P.2d 1028, 1030 (Utah 1979)).

In this case however, the United States seeks to do exactly the opposite. In short, the United States seeks to disregard the corporate form in order to attach the assets of a corporation to satisfy the liabilities of an individual shareholder.

The Tenth Circuit has previously considered how federal courts in this Circuit should address this question in cases applying Utah law:

> [I]t is far from clear that Utah has adopted [this] doctrine of 'reverse' piercing. . . .
> Absent a clear statement by the Supreme Court of Utah that it has adopted the
> variant reverse piercing theory . . . [the court] is inclined to conclude that the more
> traditional theories of conversion, fraudulent conveyance of assets, respondeat
> superior and agency law are adequate to deal with situations where one seeks to
> recover from a corporation for the wrongful conduct committed by a controlling
> stockholder without the necessity to invent a new theory of liability.

*Cascade Energy & Metals Corp.*, 896 F.2d at 1576-77 (citing *Messick v. PHD Trucking Serv.*, 678 P.2d 791, 793 (Utah 1984)). The Tenth Circuit further explained this reluctance to adopt the reverse piercing theory:

> First, the theory bypasses normal judgment-collection procedures whereby judgment creditors attach the judgment debtor's share in the corporation and not the corporation's assets. Second, third parties [or other shareholders] may be unfairly prejudiced if the corporation's assets can be attached directly. . . . [Third,] the prospect of losing out to an individual shareholder's creditors will unsettle the expectations of corporate creditors who understand their loans to be secured-expressly or otherwise by corporate assets.

*Floyd v. IRS*, 151 F.3d 1295, 1299 (10th Cir. 1998).[6]

Admittedly, some of the reasons for the Tenth Circuit's reluctance to adopt a reverse piercing theory in the *Floyd* decision may not apply in this case. For example, Ardco Leasing and Springfield Finance are both subsidiaries of Ardco. And the United States alleges that over 95% of Ardco's shares are primarily owned by Mr. Badger or entitles controlled by Mr. Badger. The remaining 4.64% of Ardco's stock is spread over approximately 1,000 shareholders. It is unlikely here that any individual third party shareholders will lose a great deal of money if Ardco's assets were directly attached to satisfy Mr. Badger's liabilities.

The court nevertheless follows the general instruction of the Tenth Circuit, and declines to apply a reverse piercing theory where the Utah Courts have not expressly adopted such an approach. The parties cite the court to no doctrinal developments since *Floyd* that would warrant a departure from the Tenth Circuit's previous guidance. Accordingly, the court grants

---

[6] *But see Transamerica Cash Reserve, Inc. v. Dixie Power and Water, Inc.*, 789 P.2d 24, 26 (Utah 1990) (holding that the reverse piercing "issue has yet to be addressed in Utah, although it follows logically from the basic premise of the alter ego rule and appears consistent with our case law," but declining to apply the reverse piercing doctrine); *Colman v. Colman*, 742 P.2d 782, 784-85 (Utah Ct. App. 1987) (finding that an Oil Corporation was an individual defendant's alter ego in a case involving distribution of matrimonial assets).

Defendants' summary judgment motions with respect to the United States' claims that Defendants are alter egos of Mr. Badger.

## VI. Equitable Relief

The United States contends for the first time in its opposition to Defendants' motions for summary judgment that the court, either under the theory of nominal defendants or the court's inherent contempt powers, may use its equitable powers to order the Defendants to aid in the collection of Mr. Badger's disgorgement order. The court disagrees for the reasons that follow.

### A. Nominal Defendants

The United States argues that under the theory of nominal defendants, the court may use its broad equitable powers to order the Defendants to aid in the collection of Mr. Badger's disgorgement order. The Fourth Circuit explains that the nominal defendant theory "is an obscure common law concept that has come to be applied in the context of the Security Exchange Act (SEA) of 1934[.]" *Commodities Future Trading Com'n v. Kimberlynn Creek Ranch, Inc.*, 276 F.3d 187, 191 (4th Cir. 2002). Under this theory, federal courts may allow joinder of a "nominal defendant . . . to aid the recovery of relief." *Commodities Future Trading Com'n v. Kimberlynn Creek Ranch, Inc.*, 276 F.3d 187, 191 (4th Cir. 2002). This aid allows the court "to afford complete relief" and "no cause of action is asserted against a nominal defendant." *Id.* In addition, the nominal defendant "is a person with no ownership interest in the property which is the subject of the litigation." *SEC v. George*, 426 F.3d 786, 800 (6th Cir. 2005). Rather, "the nominal defendant is a trustee, agent, or depository, who has possession of the funds which are the subject of litigation, [so] he must . . . be joined purely as a means of facilitating collection." *SEC v. Cherif*, 933 F.2d 403, 414 (7th Cir. 1991).

The United States raised this argument for the first time in its opposition to Defendants' summary judgment motions. In view of the fact that the United States had ample opportunity in the pleading stage to assert this theory but failed to do so, the court concludes that this request for relief is untimely and inappropriate.

But even if the Defendants timely sought this relief, the nominal defendant theory would still be inapplicable for two reasons. First, the characteristics of a nominal defendant and the Defendants in this action are different. The nominal defendant is generally one that has possession but no ownership of the assets that are the subject of the litigation, and the court joins the nominal defendant purely as a means of facilitating collection. But here, the Defendants in this action assert their own ownership interests in the assets that are the subject of the litigation. Second, the characteristics of an action where the court uses the nominal defendant theory and this action are different. Courts generally use the nominal defendant theory in government enforcement actions to afford complete relief, and no cause of action is asserted against a nominal defendant. But here, all the causes of action relate to and are asserted against the Defendants. The United States is not asking the Defendants to aid in the recovery of relief, rather the United States is, in effect, seeking a declaration to compel Defendants to pay for Mr. Badger's liability.

Thus, the court finds that the nominal defendant theory is inapplicable to this action, and the court declines to use its broad equitable powers under that theory to order the Defendants to aid in the collection of Mr. Badger's disgorgement order.

### B.      Contempt Powers

In response to Defendants' summary judgment motions, the United States also argues for the first time that the court may use its contempt powers to disgorge Defendants. Indeed, the

Ninth Circuit has held that "[d]istrict courts have broad equitable power to order appropriate relief in civil contempt proceedings." *SEC v. Hickey*, 322 F.3d 1123, 1128 (9th Cir. 2003) And "the Supreme Court has repeatedly emphasized the broad equitable powers of the federal courts to shape equitable remedies to the necessities of particular cases, especially where a federal agency seeks enforcement in the public interest." *Id.* at 1131. This power allows "courts to reach third parties in order to effect orders in securities fraud enforcement actions[.]" *Id.*

But this claim is neither properly pleaded nor timely raised. In addition, any claim for contempt of the consent judgment is more properly asserted in the original action where that judgment was entered.

In view of these facts and findings, the court declines to use its equitable powers to order that Defendants pay for Mr. Badger's consent judgment liability.

## CONCLUSION

For the reasons stated, the court enters the following rulings:

1. The court DENIES as MOOT Defendants' motion for partial summary judgment. (Dkt. 79.)

2. The court DENIES as MOOT Defendants' motion for partial summary judgment as to the Badger family home and the court GRANTS Defendants' motion for partial summary judgment as to the commodities futures investment account. (Dkt. 80.)

3. As the allegations against Mrs. Badger involve only the commodities futures trading account, the court DISMISSES Mrs. Badger from the case.

4. The court DENIES the motion to strike United States' exhibits 2, 5, 6, 7, and 8 offered in opposition to Mrs. Badger's summary judgment motion. (Dkt. 97.)

5.  The court GRANTS Defendant Ardco's and Defendant Springfield Finance's motions for summary judgment and DISMISSES them from this case. (Dkt. Nos. 109, 110.)

6.  The court GRANTS Defendants David Badger as Trustee of the SB Trust, SB Trust, and Ardco Leasing's joint motion for summary judgment and DISMISSES them from this case. (Dkt. 114.)

The court is unaware of any claims or issues remaining in the case in light of this ruling. Notwithstanding any objections it may have to this Memorandum Decision and Order, the United States is directed to notify the court within fourteen days of the entry of this Order if it believes any remaining issues must be resolved before this case is closed. Absent such a filing, the court will order the Clerk of Court to close the case.

SO ORDERED this 16th day of July, 2014.

BY THE COURT:

_____
ROBERT J. SHELBY
United States District Judge